STATE v. THOMAS L. SHIELDS.

*Homicide—Evidence.*

The prisoner and his sister were examined as witnesses in his behalf, from which it appears that the prisoner, having heard that an improper intimacy existed between his sister and the deceased, and that the latter was about to leave the neighborhood, went to see him and urged him to marry her before he left. The deceased peremptorily refused to do so, and thereupon a difficulty ensued in which the prisoner killed the deceased. In reply to the testimony of the female witness and to contradict her and the prisoner, the

state introduced a letter, written by the deceased to the female witness the night before the homicide, addressed to but never received by her; *Held*, on trial for murder:

(1) Upon an inspection of the testimony and the letter, as set out in the record, that the latter does not contradict the former, and it was therefore incompetent for that purpose.

(2) The letter was not competent to prove any fact stated by the deceased, and especially that he intended to marry her, because in this view it was hearsay merely.

(3) Nor was it competent as original evidence of the state of the affections of deceased towards her, from which the jury might draw the inference that the deceased intended to marry her, since it does not contain anything indicating a purpose on his part to do so.

(*Ingram* v. *Watkins*, 1 Dev. & Bat., 442; *State* v. *Waters*, 3 Ired., 445; *Churchill* v. *Lee*, 77 N. C., 341; *March* v. *Verble*, 79 N. C., 19; *State* v. *White*, 89 N. C., 462; *State* v. *Allen*, 1 Hawks, 6; *Patton* v. *Porter*, 3 Jones, 539; *Hislop* v. *Hoover*, 68 N. C., 141 ; *State* v. *Mikle*, 81 N. C., 552; *Winborne* v. *Lassiter*, 89 N. C., 1, cited and approved).

INDICTMENT for murder tried at Fall Term, 1883, of MECK-LENBURG Superior Court, before *Gilmer, J.*

The prisoner is charged with killing one Joseph G. Sitton. Numerous exceptions were taken on the trial, but it is not deemed necessary to an understanding of the opinion of this court to set out more than is applicable to the point decided.

The state introduced evidence tending to show that on Tuesday, 5th of June, 1883, the prisoner, who lived with his father's family, about 250 yards from the house of his brother, David Shields, who had married a sister of the deceased, went to the house of the latter, where the deceased boarded, between six and seven o'clock in the forenoon, with his gun, and, after some conversation with his brother's wife, went into a room where deceased was reading. Prisoner said to deceased, "lets' go upstairs," and they went up to deceased's room. In a very short time thereafter, the report of a gun was heard in the room. The prisoner came out of the house with his gun, and upon meeting his brother David, was asked by him, "what are you doing frightening this child"—referring to his wife, who was alarmed; and the prisoner said, "you needn't be frightened, for I have

killed him"—the deceased; and upon being asked why he had done this, stated that the deceased had seduced his sister, Mollie Shields. He was then told that the deceased loved Mollie and wanted to marry her, and the prisoner said, "I've just asked him to marry her, and he said he would not do it." Nothing was said by prisoner about acting in self-defence.

The prisoner testified, among other things, in his own behalf that he went to see the deceased for no other purpose than to induce him to marry his sister and repair the wrong he had done her, and they went up to deceased's room; that deceased was in the habit of carrying a pistol, and not knowing what would be the result of the interview, the prisoner took his gun with him and put it just outside the room door. After some conversation about an account, the prisoner said to deceased: "I want you to marry my sister Mollie before you leave," telling him at the same time that he had seduced her, and deceased replied: "I can't do it, I'll die first," and put his hand in his hip pocket as if to draw a pistol, which was in his hip pocket, and the prisoner immediately reached for his gun and fired upon the deceased without taking aim, and then went down stairs and told what he had done. On Wednesday night before the homicide he saw deceased come out of his sister's room through a window.

Mollie Shields was introduced as a witness, in corroboration of the prisoner's statement, and testified (among other things set out in the opinion here) that the deceased had connection with her once; that she had known him about a year, and that she had engaged herself to him, and he had promised to marry her; that he visited her at night only and without the knowledge of the prisoner; that at the signal of a light at her room window the deceased would come; that when the prisoner told her he was going to see deceased and ask him to marry her, and said that she need not be surprised if there should be trouble, she replied: "I don't care what you do, the way he has treated me."

On cross-examination of this witness, the state exhibited to her and read to the jury, without objection, a number of letters,

bearing date from September 22, 1882, up to and including June 2, 1883, which she identified as letters written by her to the deceased.

The state, in reply to her evidence, and as tending to contradict both her and the prisoner, also offered in evidence a letter dated June 4, 1883, which was proved to be in the handwriting of the deceased (who was writing till a late hour on the night before the homicide) and found in his trunk with other letters and papers, after his death on the next morning. The state admitted that this letter was never mailed and never received by Mollie Shields. The prisoner objected to its introduction, but the court allowed it to be read to the jury and the prisoner excepted.

The extracts from these letters, set out in the opinion of the court, are sufficient to show the nature and character of the correspondence between Mollie Shields and the deceased.

The jury returned a verdict of guilty, and the prisoner appealed from the judgment pronounced thereon.

*Attorney-General*, for the State.
*Messrs. W. P. Bynum* and *Wilson & Son*, for prisoner.

MERRIMON, J.  The letter of the deceased, written the night before, and found in his trunk soon after the homicide, addressed to, but never received by Mollie Shields, the witness and sister of the prisoner, and admitted in evidence, was incompetent and ought to have been rejected.

The prisoner was examined on the trial as a witness in his own behalf, and his sister Mollie was likewise examined for him, her testimony tending mainly to corroborate his.  The principal purpose of their testimony was to show that the prisoner, having learned that the deceased had seduced his sister and was about to leave the neighborhood, went to see him for the purpose of urging him to marry her before he left; that he saw the deceased in the latter's chamber, and said to him: " Joe, I want you to marry

Mollie before you leave"; telling him at the same time that he had seduced and must marry her; whereupon the deceased replied, "I can't do it, I'll die first," and rose up, putting his hand to his hip pocket as if to draw his pistol, which was in his hip pocket, and shoot the prisoner, when the latter reached outside the door, got his gun and shot him, without taking any aim.

It was contended for the state that these witnesses had not testified truly, and an effort was made to discredit their testimony. The case settled upon appeal states that "the state, in reply to her evidence (referring to the witness Mollie Shields), and as tending to contradict both her and the prisoner, offered in evidence a letter dated June 4, 1883, a copy of which is also attached hereto as a part of the case, which the state proved was in the handwriting of the deceased, who was writing till a late hour on the night before the homicide, and was found in his trunk with other letters and papers after his death the next morning. The state admitted that this letter was never mailed and never received by Mollie. The prisoner objected to the introduction of this letter, but the court allowed it to be read to the jury, and the prisoner excepted."

It thus appears that the avowed purpose of introducing the letter in question was to reply to and contradict the testimony of the prisoner and his sister.

The case as presented by the reecord fails to specify in what respect, or how the letter contradicts or tends to contradict what was sworn to by them, nor did counsel on the argument inform us. Upon a careful examination and consideration of their testimony and the letter, we are unable to discover wherein the latter contradicts the former in any material respect. Indeed, in several particulars, the letter tends strongly to confirm what the witnesses said. Their testimony might be true, and yet the letter might represent the feelings of the deceased, as he therein expressed them, at the time it was written. The letter is a ridiculous, rhapsodical protestation of love for, and wild, unreasnoable devotion to, the girl. Its whole spirit is that of unbridled pas-

sion. It suggests lustful desire, rather than pure affection and honorable devotion flowing from it. It protests the writer's burning love for the girl *ad nauseum*, but no reference whatever is made in it, by terms or reasonable implication, to marriage. Reference, however, is repeatedly made to the last interview the writer had with the girl on Wednesday night next preceding the homicide. That was the night the prisoner swore he discovered the deceased in his sister's room, and it was the occasion on which he debauched her, as she testified. Referring to the occasion, he says in the letter: "Darling, I want you to remain true to me, and when I do come I want to see you as loving as you were the last time I saw you." And again referring to it, he says: "Yet I hope it shall not be for a great while until I see you, and then, darling, I want you to be the same loving Mollie to me that you were when last I saw you." In another place he says: "Well, darling, five to eleven o'clock to-night, and I am sadly disappointed again. I have been waiting and watching that light, but reckon I'll have to give it up and go to bed." It is also stated in the letter that the writer was about to take his departure from the neighborhood for an indefinite length of time.

All this wild manifestation of passion was not inconsistent with the testimony of the prisoner and his sister. The prisoner testified that he asked the deceased to marry his sister, and he peremptorily refused to do so. This may or may not have been true, but the letter makes no reference to marriage; it does not hint at it, unless words expressive of wildest passion could be construed to imply it. As he was about to depart from the neighborhood for some time, if he was looking forward to marriage, how natural and appropriate that he should have made some reference to his purpose to return as soon as practicable, and claim her for his wife. But he makes no reference in the letter to any such purpose. The prisoner swore that he discovered the deceased in his sister's room on the Wednesday night next before the homicide, and that he told the deceased he had seduced his sister. The letter does not contradict this; it cannot

be so construed; on the contrary, it might be contended that it tends rather to confirm it.

The witness Mollie Shields swore that she had written to the deceased the letters attributed to her, and as well those sent up as part of the case. In their extravagant expressions of love, they are not unlike that of the deceased; but they are not inconsistent with it. She swore that he had criminal intercourse with her on the night mentioned; that she had known him about twelve months and had engaged herself to him; that he visited her in the night-time only; that at the signal of a light at the window he would come to it; that he had promised to marry her, and, on the Wednesday night mentioned, had promised to come back on the next Monday night; that she never talked with him after that Wednesday night, though she saw him; that she said to the prisoner at the breakfast table on the morning of the homicide, "I don't care what you do, the way he has treated me." This, whether true or false, was in nowise inconsistent with the letter; nor did it contradict what she said in any particular.

In our judgment, the letter did not contradict the prisoner or his sister, either in substance or effect; and it did not, therefore, serve the purpose for which it was put in evidence.

It seems that it may have been intended to prove, by an inference the jury might draw from the letter, that the purpose of the deceased was not seduction; that he was earnestly and sincerely attached to, and his purpose was to marry the girl; and, therefore, it was not probable, but altogether improbable, that he said to the prisoner when requested by him to marry her, "I can't do it, I'll die first," and made an effort to draw his pistol and shoot the prisoner.

Putting out of view for the present the remoteness of such an inference, the letter was not competent to prove the facts that warranted it. It must be treated as containing the declaration of the deceased, and it cannot have any other or greater pertinency, as evidence, than if he had said orally what he wrote in

the letter. If he had said in the hearing of witnesses what he wrote in the letter, his oral declarations would not have been competent. If the inference sought to be drawn from the letter had been embodied in terms, and declared by the deceased in the presence of witnesses, such declaration would not have been competent as evidence.

Thus, if, instead of saying what was written in the letter, the deceased had said the night before the homicide in the presence of witnesses, " I am engaged to marry Mollie Shields ; I intend to marry her; I am going off on matters of business, but will return in a month, and we shall then be married "; this would have been incompetent, because it would have been hearsay. And if the letter had contained these or the like expressions, it would have been on the same footing. As evidence of what it contained, either in terms or by implication, it was hearsay. It contained the declarations of a third party not under oath, nor a witness on the trial whom the prisoner had an opportunity to cross-examine. Such evidence in a case like this is not admissible. *Ingram* v. *Watkins*, 1 Dev. & Bat., 442 ; *State* v. *Waters*, 3 Ired., 455 ; *Churchill* v. *Lee*, 77 N. C., 341. See also Stephens' Digest of the Law of Evi., ch. 3, art. 11.

Nor was the letter competent as original evidence, as an expression of the feelings of affection of the deceased towards the girl. This was in nowise material. Whether he loved her sincerely and his motives were pure, or his purpose was to gratify his lustful appetite, was not a material inquiry on the trial.

If it be said that his purpose was pure, and to marry the girl, and the jury might properly infer this fact from the state of his affections as manifested by the letter, we cannot yield our assent to such a proposition. If so remote an inference could be allowed in any case, it could not be allowed in this; for the purpose to marry the girl as manifested in the letter by any state of the affections developed by it, is so remote, indefinite, uncertain and shadowy, that it cannot be treated as evidence warranting an inference.

As we have said, the letter makes no reference to marriage, although the occasion on which it was written was appropriate to do so, if the writer contemplated it. It is replete with expressions of burning passion, and repeated references to and hints at pleasures very questionable, and that do not point to wedlock. There must be *evidence* from which an inference may be drawn, when it is allowable. *March* v. *Verble*, 79 N. C., 19; *State* v. *White*, 89 N. C., 462, and cases there cited.

So that in any view of the case, without intending to intimate any opinion as to the guilt or innocence of the prisoner, we think that the letter was not competent as evidence.

What measure of influence the letter had upon the minds of the jury, we cannot determine. It is sufficient that we can see that it might possibly have been used with considerable effect to the prejudice of the prisoner. Where incompetent and irrelevant evidence, objected to, is admitted, that might reasonably prejudice the party complaining, he is entitled to a new trial. *State* v. *Allen*, 1 Hawks, 6; *Patton* v. *Porter*, 3 Jones, 539; *Hislop* v. *Hoover*, 68 N. C., 141; *State* v. *Mikle*, 81 N. C., 552; *Winborne* v. *Lassiter*, 89 N. C., 1.

There is error, for which the prisoner is entitled to a new trial. Let this opinion be certified to the superior court of Mecklenburg county, to the end that that court may proceed in the case according to law.